Opinion
SILVER, P. J.-
Introduction
The People of the State of California appeal from an adverse judgment entered upon the order of the municipal court sustaining Williams’ demurrer, without leave to amend, to the People’s complaint. Williams was cited for travelling 65 miles per hour, 10 miles per hour faster than the maximum speed limit in violation of California Vehicle Code section 22348, subdivision (a). The demurrer raised two constitutional objections to this state’s 55-mile-per-hour maximum speed law:
(1) California adopted the maximum speed limit as the result of federal coercion and in violation of the Tenth Amendment to the federal Constitution; and
(2) California impermissibly delegated its legislative authority to Congress by conditioning repeal of the state speed limit upon federal repeal of the national speed limit.
For reasons discussed below, we reject respondent’s constitutional challenge and reverse the decision of the trial court.
The constitutional issues raised by Williams in the instant action are not novel. The extent to which Congress may in the exercise of its delegated powers utilize the states and their political machinery to pursue federal policy goals has been the subject of much litigation and commentary. The issues are complex and the courts have experienced difficulty in striking an appropriate balance between the federal interest in establishing uniform national policy and local concerns of states necessitating peculiarly local resolution. (Compare National League of Cities v. Usery (1976) 426 U.S. 833 [49 L.Ed.2d 245, 96 S.Ct. 2465] with Garcia v. San Antonio Metropolitan Transit Authority (1985) 469 U.S. 528 [83 L.Ed.2d 1016, 105 S.Ct. 1005].) We respect the trial court’s concern over these issues and recognize the constitutional importance of striking an appropriate balance between federal and state power.
*Supp. 21 Legislative History
On January 2, 1974, during the embargo of oil sales to the United States by Arab members of the Organization of Petroleum Exporting Countries (OPEC), the United States Congress established a national 55-mile-per-hour speed limit in the Emergency Highway Energy Conservation Act (Pub.L. No. 93-239, 87 Stat. 1046). The law was an emergency measure designed to reduce the nation’s fuel consumption during the embargo. (1973 U.S. Code Cong. & Admin. News, pp. 3344, 3345.) Section 2(a) of the act conditioned the receipt of federal funds upon each state establishing a 55 miles per hour maximum speed limit upon the public highways within its jurisdiction.[1] Section 2(e) provided that the emergency act was subject to termination by executive order when the President had determined that the fuel shortage crisis had passed or, alternatively, automatic termination on June 30, 1975, whichever date occurred first. (1973 U.S. Code Cong. & Admin. News, pp. 1170, 1171.) Section 3 made available to the states 90-percent federal funding for approved demonstration projects designed to encourage the use of car pools in urban areas. (Id., at pp. 1171-1172.)
California quickly followed suit, enacting Vehicle Code section 22348, subdivision (a) by emergency legislation on January 1, 1974. (Stats. 1973, ch. 1218, § 1, p. 2935.) Section 4 of the legislation declared its purpose to be the institution of “more realistic reduced speed limits as a measure to help alleviate serious and far-reaching fuel shortages . . . .” (Id., §4, p. 2935.) Section 1 of the 1973 legislation provided that Vehicle Code section 22348 would remain in effect only until June 30, 1975, unless extended by a later enactment.
One year later (Jan. 4, 1975) Congress acted to make permanent a national 55-mile-per-hour speed limit by continuing an incentive approach which barred federal highway aid to states which failed to enact a maximum state speed limit of 55 miles per hour. (Pub.L. No. 93-643, 88 Stat. 2281, §11.) “The legislative history of this bill clearly shows that Congress sought this more permanent 55 m.p.h. speed limit for both highway safety and fuel conservation reasons.” (Marks v. Mobil Oil Corp. (E.D.Pa. 1983) 562 F.Supp. 759, 771, aff’d 727 F.2d 1100.) As the House Public Works Committee stated in its report on the bill: “The benefits of the lower maximum speed limit has [sic] been so substantial that the Committee is proposing that it be continued until such time as the Congress declares by *Supp. 22 concurrent resolution that it is no longer necessary. [¶] According to reports from the Federal Energy Administration, over five million gallons of fuel have been saved daily as a result of the reduction in speeds and travel on the highways. This should be reason enough to maintain the lower speed limits; however, there has also been a sharp reduction in highway fatalities. The National Highway Traffic Safety Administration has estimated a 20-percent drop in traffic fatalities, which represents 1,000 fewer Americans being killed each month. [¶] . . . Results of a National Safety Council study indicate that 46 percent of the reduction is the result of reduced speeds .... A recent study by the American Association of State Highway and Transportation Officials found that approximately half of the reduction in traffic fatalities is the result of reduced speeds and more uniform speeds . . . .” (House Report No. 93-1567, reprinted in 1974 U.S. Code Cong. & Admin. News, at p. 8019.)
The bill added section 154 to chapter 1 of title 23 of the United States Code providing that the Secretary of Transportation could not approve any project under section 106 of title 23[2] in any state which has a maximum speed limit on any public highway within its jurisdiction in excess of 55 miles per hour. (Pub.L. No. 93-643, § 114, reprinted at 1974 U.S. Code Cong. & Admin. News, at p. 2657.) The bill also added section 141 which requires states to certify annually that they were enforcing the 55-miles-per-hour speed limit. (Pub.L. No. 93-643, § 107, reprinted at 1974 U.S. Code Cong. & Admin. News, at p. 2654.)
Due to the impending repeal of the California legislation on June 30, 1975, the California Legislature by emergency legislation extended the date of repeal until June 30, 1978. (Stats. 1975, ch. 153, § 1, p. 285.) The federal legislation no longer had a termination date. Three years later, the California Legislature, facing automatic repeal of section 22348, again acted to preserve the 55-mile-per-hour speed limit. In apparent response to the permanency of the federal legislation they enacted section 2 of Statutes 1978, chapter 217 (at p. 467) as follows: “It is the intent of the Legislature, in enacting this act, to recognize that the 55-mile-per-hour national maximum speed limit, as specified in Section 154 of Title 23 of the United States Code, which, when originally enacted would have terminated on June 30, 1975, no longer contains an automatic termination date. In recognition of this, the Legislature finds it appropriate to amend Section 22348 of the Vehicle Code accordingly. [¶] It is the further intent of the Legislature that if such 55-mile-per-hour maximum speed limit is ever revised by either increasing or decreasing such limit, the Legislature will review the provisions of Section 22348 of the Vehicle Code to ascertain whether it would be appropriate to amend such provisions.”
*Supp. 23 Accordingly the Legislature added subdivision (c) to California Vehicle Code section 22348 which provided that section 22348 “shall remain in effect 120 days from the date that the 55-mile-per-hour national maximum speed limit, as specified in section 154 of Title 23 of the United States Code, is repealed.” (Stats. 1978, ch. 217, § 1, p. 466.)

The Enactment of Vehicle Code Section 22348, Subdivision (c) Did Not Constitute a Delegation of Legislative Power to the Federal Government.

Article IV, section 1 of the California Constitution provides that: “[t]he legislative power of this State is vested in the California Legislature . . . .” The power to declare whether or not there shall be a law, to determine the general purpose or policy to be achieved by the law and to fix the limits of its operation cannot be delegated.
“ ‘An unconstitutional delegation of legislative power occurs when the Legislature confers . . . unrestricted authority to make fundamental policy decisions. [Citations.]’ In order to avoid an unlawful delegation of its authority, the Legislature must first resolve the ‘truly fundamental issues,’ and must then ‘establish an effective mechanism to assure the proper implementation of its policy decisions.’ (Kugler v. Yocum, [(1968)] 69 Cal.2d [371,] at pp. 376-377 [71 Cal.Rptr. 687, 445 P.2d 303].)” (Wilkinson v. Madera Community Hospital (1983) 144 Cal.App.3d 436, 442 [192 Cal.Rptr. 593].)
The fact that a third party, whether private or governmental, performs some role in the application and implementation of an established legislative scheme does not render the legislation invalid as an unlawful delegation. (Kugler v. Yocum (1968) 69 Cal.2d 371, at pp. 379-380 [71 Cal.Rptr. 687, 445 P.2d 303]; Salmon Trollers Marketing Assn. v. Fullerton (1981) 124 Cal.App.3d 291, 299 [177 Cal.Rptr. 362].) “In order to hold a statute invalid as an unlawful delegation of legislative power, it must be clear that without the exercise of legislative power by the person or body to whom the delegation has been made, the statute remains incomplete so that the legislative will has not been fully made known.” (16 C.J.S., Constitutional Law, § 137, pp. 448-449, fn. omitted.)
In this case the California Legislature has not delegated its “legislative power” to enact laws for the regulation of speed laws in California or its “function” to determine the contents of those speed laws. In enacting the 55-mile-per-hour speed limit the Legislature declared its purpose to be the institution of “more realistic reduced speed limits as a measure to help alleviate serious and far-reaching fuel shortages . . . .” (Stats. 1973, ch. 1218, § 4, at p. 2935.) The exercise of legislative discretion was in the determination that the policy of California will be to conform its maximum *Supp. 24 speed limit upon public highways with the national standard as a joint effort with the federal government to curtail the national fuel shortage and to encourage traffic safety upon public highways. The fact that California has adopted legislation conforming to federal standards does not, in and of itself render the legislation invalid. (See, e.g., Brock v. Superior Court (1937) 9 Cal.2d 291 [71 P.2d 209]; Salmon Trollers Marketing Assn. v. Fullerton, supra, 124 Cal.App.3d 291 [177 Cal.Rptr. 362].) Further, the California Legislature may condition the continued validity of a statute upon a state of events in the control of a third party, be it a private or governmental agency, as long as California retains control over fundamental policy decisions, insures against abuses of the delegated power, and makes no attempt to enact future regulations of another jurisdiction as part of state law. Here California has retained absolute authority to establish speed limits within its territorial boundaries, thus ensuring that the federal government cannot arbitrarily impose a maximum speed limit in California. The California statute does not provide that, if the federal maximum speed limit is ever revised, such amendment will be automatically applicable in California. The Legislature declared “that if [the] 55-mile-per-hour maximum speed limit is ever revised by either increasing or decreasing such limit, the Legislature will review the provisions of Section 22348 of the Vehicle Code to ascertain whether it would be appropriate to amend such provisions. ” (Stats. 1978, ch. 217, § 2, p. 467, italics added.) To accomplish this review the statute provided that the 55-mile-per-hour speed limit would remain in effect 120 days after any federal change in the national speed limit. (Id., § 1, p. 466.)
The statutory scheme at issue here is similar to that upheld by the Supreme Court of Kansas in State v. Dumler (1977) 221 Kan. 386 [559 P.2d 798], and significantly different from that overturned by the Supreme Court of Montana in Lee v. State (1981) 195 Mont. 1 [635 P.2d 1282], cert. den. 456 U.S. 1006 [73 L.Ed.2d 1300, 102 S.Ct. 2295].
In response to the 1974 federal legislation, Kansas, like California, adopted legislation establishing a maximum speed limit of 55 miles per hour (Laws 1974, chs. 29 and 30, codified at Kan.Stat.Ann. 1974 Supp. 8-1336), and authorized revision of the statutory maximum speed limit if Congress decided to alter the limit: “In the event that Congress of the United States shall establish a maximum speed limit greater or less than the limit prescribed by this paragraph, the state highway commission may adopt a resolution, subject to the approval of the governor, establishing such speed limit as the maximum speed limit of this state.” (Kan.Stat.Ann. 1974 Supp. 8-1336, subd. (3).)
The Kansas legislation “suspended” the operation of its existing speed laws and the power of the state highway commission or local authorities to *Supp. 25 establish maximum speed limits until the date upon which Congress removed all restrictions upon maximum speed laws. (Kan.Stat.Ann. 1974 Supp. 8-1340.) Section 8-1340 provided in pertinent part: “The provisions of this act shall expire on the date when the Congress of the United States shall remove all restrictions on maximum speed limits, and until said date [the statutes] of this State establishing or authorizing the state highway commission or local authorities to establish maximum speed limits are hereby suspended.”
The Kansas Supreme Court rejected the appellant’s contention that the new maximum speed law was an unconstitutional delegation of legislative power of the State of Kansas to the United States. Appellant contended then, as Williams does here, that by making the maximum highway speed limit in Kansas contingent upon future actions of the United States Congress, it would be Congress which would dictate the Kansas maximum speed limit.
In rejecting this contention the Kansas Supreme Court stated: “In analyzing 8-1336 and 8-1340 it is clear that the Kansas legislature has by no means totally yielded to the Congress its authority to establish maximum speed limits in Kansas. By virtue of 8-1340 the supplemental act, which creates the 55 miles per hour speed limit, expires on the date when the Congress of the United States shall remove regulations on maximum speed limits and the provisions of 8-1557, 8-1558, 8-1559, and 8-1560 [establishing a daytime speed limit of 70 miles per hour and a 60 mile-per-hour limit during the nighttime] immediately come into operation. Should Congress prescribe a different maximum speed limit for a state to qualify for federal highway funds, such action does not per se establish a new maximum speed limit in Kansas. When congressional action occurs, it is the state highway commission (secretary of transportation) acting pursuant to statute who has authority to establish the maximum speed limits of this state. Here the legislature, rather than delegating legislative power to the Congress, has simply enacted a law to become operational on the happening of a certain contingency or future event.” (State v. Dumler, supra, 559 P.2d at p. 804.) The California statutes provide a similar scheme of review.
In comparison, the Montana Supreme Court invalidated legislation granting the United States Congress unrestricted authority to establish speed limits within the State of Montana. The Montana Legislature mandated that the Attorney General, by proclamation, change the speed limit on public highways to equal the maximum speed limit established by the federal government whenever the federal government established such a maximum speed limit as a condition to the state’s continuing eligibility to receive funds authorized by the Federal Aid Highways Act of 1973, and to terminate the proclaimed speed limit “whenever such a speed is no longer required by *Supp. 26 federal law.” (Mont.Code Ann., § 61-8-305(2).) The court distinguished Dumler. In the Kansas legislation the power granted to a state official or body to adopt speed limits was couched in permissive instead of mandatory terms. (Lee v. State, supra, 635 P.2d at p. 1286; cf. City of Princeton v. Francisco (S.D. Iowa 1978) 454 F.Supp. 33, 34.) Had the Legislature itself established the speed limit, the court would have upheld the statute’s constitutionality. “We want to state clearly that had the legislature itself established the speed limit originally or at any subsequent session, we should then have found such enactment constitutional, even though it may have been in response to the federal requirements.” (Lee v. State, supra, 635 P.2d at p. 1287.) California’s legislation is not only permissive but provides for a 120-day delay and review period.

Congress’ Adoption of 23 United States Code, Section 154(a), Conditioning State Receipt of Federal Aid for State Highway Projects Under the Federal-Aid Highway Act (23 U.S.C. § 101 et seq.) Upon Participating States ’ Enforcement of a 55-mile-per-hour Maximum Speed Limit Within Their Territorial Limits Is a Valid Exercise of Congressional Power Under the Spending Clause (U.S. Const., art. I, § 8, cl. 1).

A legislative act is presumed to be constitutional. “[NJothing but a clear violation of the Constitution will justify a Court in overruling the legislative will.” (People v. Parks (1881) 58 Cal. 624, 635; see FERC v. Mississippi (1982) 456 U.S. 742, 754 [72 L.Ed.2d 532, 543, 102 S.Ct. 2126], reh. den. 458 U.S. 1131 [73 L.Ed.2d 1401, 103 S.Ct. 15].) ‘“Unconstitutionality must be clearly shown, and doubts will be resolved in favor of its validity.’ ” (Salmon Trollers Marketing Assn. v. Fullerton, supra, 124 Cal.App.3d 291, 299 [177 Cal.Rptr. 362], quoting 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, §43, p. 3281; Kizziah v. Department of Transportation (1981) 121 Cal.App.3d 11, 18 [175 Cal.Rptr. 112].)
The spending power is encompassed in article I, section 8, clause 1, of the United States Constitution and states that the “Congress shall have Power To lay and collect Taxes . . . to . . . provide for the . . . general Welfare of the United States . . . .” Although article I, section 8 lists certain specific areas for which Congress has the “power to spend,” it has been held that the “power to spend” encompassed within the “general welfare” clause is not limited to these specific areas. The “general welfare clause” is itself an independent—and expansive—source of Congress’ spending authority. (Buckley v. Valeo (1976) 424 U.S. 1, 90-91 [46 L.Ed.2d 659, 728, 96 S.Ct. 612]; State of Okl. v. Schweiker (D.C. Cir. 1981) 655 F.2d 401, 405.) Moreover, Congress may attach conditions to the disbursement of federal funds as long as those conditions are related to a legitimate national *Supp. 27 goal in providing for the general welfare of the nation, have a rational relationship to the purpose of the federal funds whose receipt is conditioned, and are unambiguous. (Pennhurst State School v. Halderman (1981) 451 U.S. 1, 17 [67 L.Ed.2d 694, 707, 101 S.Ct. 1531]; Oklahoma v. Civil Service Comm’n. (1947) 330 U.S. 127, 143 [91 L.Ed. 794, 806, 67 S.Ct. 544]; Steward Machine Co. v. Davis (1937) 301 U.S. 548, 590-593 [81 L.Ed. 1279, 1293-1294, 57 S.Ct. 883].) The conditions need not be restricted to those areas over which Congress has direct regulatory authority. (State of Okl. v. Schweiker, supra, at p. 406.) Moreover, when Congress is legislating for the “general welfare,” the means chosen by Congress to effectuate the congressional purpose are necessarily valid if Congress could reasonably conclude that “the means are ‘necessary and proper’ to promote the general welfare.” (Buckley v. Valeo, supra, at p. 91 [46 L.Ed.2d at p. 728].) The concept of the general welfare is not a static one. “Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the nation. What is critical or urgent changes with the times.” (Helvering v. Davis (1937) 301 U.S. 619, 641 [81 L.Ed. 1307, 1315, 57 S.Ct. 904].)
There appear to be four prerequisites to a finding that a spending clause measure and condition attached to it are valid: (1) The federal power is used for a legitimate national purpose, i.e., promotion of the general welfare (Oklahoma v. Civil Service Comm’n., supra, at p. 143 [91 L.Ed. at p. 806]; Steward Machine Co. v. Davis, supra, at pp. 585-590 [81 L.Ed. at pp. 1290-1293]); (2) the condition is related to a legitimate national goal (Steward Machine Co. v. Davis, supra, at pp. 590-591 [81 L.Ed at pp. 1292-1293]; Note, Federal Grants and the Tenth Amendment: “Things As They Are” and Fiscal Federalism (1981) 50 Fordham L.Rev. 130, 140-141); (3) the condition is related to the purpose of the federal funds whose receipt is conditioned (FCC v. League of Women Voters (1984) 468 U.S. 407 [82 L.Ed.2d 278, 309] (Rehnquist, J., dis.); State of Okl. v. Schweiker, supra, 655 F.2d at pp. 407, 411); and (4) the condition is unambiguous (Pennhurst State School v. Halderman, supra, 451 U.S. at p. 17 [67 L.Ed.2d at p. 707].)
Each of the foregoing prerequisites is satisfied in the instant case. Preservation of the nation’s fossil fuels and reduction of traffic fatalities are matters of national concern. It has been stated that a “problem is national where its solution requires uniform treatment throughout the nation and remedial legislation by the one body that can give uniform control—the Congress.” (2 Antieau, Modern Constitutional Law (1969) § 10.28, p. 58.) The fuel conservation measures necessitated by the OPEC crisis required the attention of the federal government both on a domestic and international *Supp. 28 level. The states were completely ill-equipped to handle such a crisis; it cannot be disputed that the matter was of national concern.
Second, the condition here is reasonably tailored to effectuate the national goal. The statistics from the Federal Energy Administration establish that automobile speed is a significant factor in fuel economy and, necessarily, in preserving the nation’s fuel reserves. The reduced automobile speed was also correlated with a drastic reduction in traffic fatalities indicating that the nation’s interest in the public health of its citizens was also being served by the legislation.
Third, the condition in this instance (compliance with a national 55-mile-per-hour speed limit), is reasonably related to one of the purposes of the federal spending measure (Federal Aid Highway Act) because it promotes traffic safety. Section 105(f) of title 23 of the United States Code requires the Secretary of Transportation to “give priority to those projects which incorporate improved standards and features with safety benefits.” Since one of the principle purposes of the Emergency Highway Energy Conservation Act is to promote safer conditions on roadways by reducing automobile speed, its purpose is necessarily correlated with that of the Federal-Aid Highway Act funding provision which also has as one of its principle purposes the improvement of roadways to improve traffic safety.
Fourth, the condition upon which highway funds are to be appropriated is clear and unambiguous: a 55-mile-per-hour speed limit must be enacted by the states as to all “highways” as defined in title 23 of the United States Code, section 101(a), or the Secretary of Transportation shall not approve any project under 23 United States Code section 106 in that state. (23 U.S.C. § 154(a).) Congress has therefore acted within its delegated power under the spending clause to condition state receipt of federal highway aid upon state assent to the federal national speed limit on all public highways within the state.

Congress’ Conditional Grant of Federal Highway Monies to States Adopting the 55-mile-per-hour Speed Limit Does Not Unconstitutionally Infringe Upon State Sovereignty Under the Tenth Amendment.

The extent to which the Tenth Amendment to the United States Constitution acts as a limitation upon the enumerated powers of Congress has been the subject of much debate. The Tenth Amendment to the Constitution provides: “The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” Up until the latter half of the 1970’s the United States Supreme Court cases interpreted the Tenth Amendment as a mere truism: *Supp. 29 “[A]ll is retained which has not been surrendered.” (United States v. Darby (1941) 312 U.S. 100, 124 [85 L.Ed. 609, 622, 61 S.Ct. 451]; see also, Sperry v. Florida (1963) 373 U.S. 379, 403 [10 L.Ed.2d 428, 442-443, 83 S.Ct. 1322].) The Tenth Amendment was not seen as establishing any constitutional limitation on the delegated powers of Congress beyond those already existent. Not surprisingly, the cases interpreting the extent of congressional power under the spending clause followed the reasoning of Darby, supra. In Oklahoma v. Civil Service Comm’n., supra, 330 U.S. 127, the Supreme Court upheld against Tenth Amendment challenge the provisions of the Hatch Act prohibiting officers and employees of state or local agencies, whose principal employment was in connection with any activity which was financed in whole or in part by federal funds, from taking any active part in political management or in political campaigns. A member of a state highway commission was also chairman of the Democratic State Central Committee and participated in political fund raising activities. Highway commission activities were financed by allotment of federal funds. The state refused to remove the official and the Civil Service Commission, pursuant to statutory authority, certified that state highway funds in an amount equal to two year’s compensation of the official at the time of the violation should be withheld.
The Supreme Court held that the act’s provisions were constitutional even though the action taken by Congress did affect local political activities. The court noted that “[w]hile the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to states shall be dispursed.” (Id., at p. 143 [91 L.Ed. at p. 806].) The court continued with the observation that “ [t]he offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual.” (Id., at p. 144 [91 L.Ed. at p. 807], fn. omitted that cites Steward Machine Co. v. Davis, supra, 301 U.S. at pp. 593-598 [81 L.Ed. at pp. 1294-1296, 57 S.Ct. 883]; United States v. Bekins (1938) 304 U.S. 27, 51-54 [82 L.Ed. 1137, 1143-1145, 58 S.Ct. 811].) The objective of the Hatch Act was to promote “better public service by requiring those who administer funds for national needs to abstain from active political partisanship.” (Oklahoma, supra, at p. 143 [91 L.Ed. at p. 806].) As a legitimate concern of Congress in promoting the public welfare, the offer of benefits to the state conditioned upon cooperation with federal plans was legitimate. (Id., at p. 144 [91 L.Ed. at p. 807].) Even though Congress did not have authority to directly regulate the political activities of employees in state and local public agencies, it could condition the receipt of federal highway funds upon acceptance of federal standards. Thus, if the spending clause measure itself was valid and the states were free to accept or reject both the optional condition and the spending *Supp. 30 measure upon which the condition was attached, the Tenth Amendment was not violated.
In Steward Machine Co. v. Davis, supra, 301 U.S. 548 [81 L.Ed. 1279, 57 S.Ct. 883] the court upheld the tax imposed as part of the Social Security Act of 1935 (49 Stat. 620, current version at 42 U.S.C. § 301 et seq.) which established a tax and credit system to induce states to set up unemployment compensation programs in accordance with federal guidelines.
The Supreme Court held that the statute did not call for surrender by the states of powers essential to their quasi-sovereign existence. The conditions imposed were limited to assuring the effectiveness of the state unemployment insurance laws and final discretion as to the type of statute to be adopted to serve this purpose was left to the states. (Steward Machine Co. v. Davis, supra, 301 U.S. at pp. 593-594 [81 L.Ed. at p. 1294].)
In 1976, the United States Supreme Court, reacting to an apparent growing concern for state interests, in interpreting the Tenth Amendment, held that Congress may not exercise its delegated powers in a fashion that impairs the states’ integrity or their “ability to function effectively in a federal system.” (National League of Cities v. Usery, supra, 426 U.S. at p. 852 [49 L.Ed.2d at p. 257, 96 S.Ct. 2465].)
In National League of Cities, several cities, states and organizations thereof had sued to test the validity of the 1974 amendments of the Fair Labor Standards Act (29 U.S.C. § 201 et seq.). This act extended statutory minimum wage and maximum hours provisions to employees of states and their political subdivisions. The court held that the amendments exceeded Congress’ power under the commerce clause in that they forced directly upon the states Congress’ choices as to how essential decisions regarding the conduct of integral governmental functions were to be made. The court noted that the extension of the wage provisions of the Fair Labor Standards Act imposed substantial cost upon the states and their political subdivisions and displaced state policies regarding the manner in which they could structure governmental services. For instance, the court stated the act would forbid states from offering part-time or summer employment at a figure less than the minimum wage and states would have to structure work periods in some employment areas, like police and fire protection, in a manner substantially different from previous practice. The court held that the effect of the amendments was to unconstitutionally interfere with an integral governmental function of the states. (Id., at p. 852.) National League of Cities “therefore drew from the Tenth Amendment an ‘affirmative limitation on the exercise of [congressional power] . . . .’” (EEOC v. Wyoming (1983) *Supp. 31 460 U.S. 226, 236 [75 L.Ed.2d 18, 29, 103 S.Ct. 1054] quoting National League of Cities, supra, at p. 841.)
Although National League of Cities was a commerce clause case which expressly reserved judgment on the application of the Tenth Amendment to other delegated powers, including the spending power (426 U.S. at p. 852, fn. 17 [49 L.Ed.2d at p. 258, fn. 17]), it was a new starting pointing in recognizing the Tenth Amendment as an active limitation on the exercise of federal powers. (See Pennhurst State School v. Halderman, supra, 451 U.S. at p. 17, fn. 13 [67 L.Ed.2d at p. 707, 101 S.Ct. 1531].)
Since the decision in National League of Cities was handed down, the frequency of Tenth Amendment challenges to conditions attached to various federal grant programs increased dramatically. Yet no case has been cited which invalidated a funding condition. (See State of Okl. v. Schweiker, supra, 655 F.2d at p. 406, fn. 9 and cases cited therein.) Instead, the federal courts have chosen to rely on the distinction drawn between direct regulation over a particular area traditionally reserved to the sovereign authority of states, and the use of the federal largesse to indirectly “induce” states to support certain federal policies. As long as the states are free to accept or reject the federally funded program and conditions attached to that program, state sovereignty is not invaded. (Florida Dept. of Health, etc. v. Califano (N.D. Fla. 1978) 449 F.Supp. 274, 284-285, cert. den. 441 U.S. 931 [60 L.Ed.2d 659, 99 S.Ct. 2051]; see City of Macon v. Marshall (M.D.Ga. 1977) 439 F.Supp. 1209, 1217-1218.) As was said by the Nebraska Supreme Court in State v. Padley (1976) 195 Neb. 358 [237 N.W.2d 883] in rejecting a similar Tenth Amendment challenge to the same federal legislation challenged herein: “We are at a loss to follow this reasoning. It is the privilege of Congress to fix the terms upon which federal money allotments to the states shall be made and it is entirely optional with the states to accept or reject such offers. There is no coercion and each state acts of its own volition.” (State v. Padley, supra, 237 N.W.2d at p. 885. Accord People v. Austin (1983) 111 Ill.App.3d 213 [443 N.E.2d 1107, 1108].)
Whatever significance National League of Cities had as establishing a Tenth Amendment limitation of federal powers was erased in Garcia v. San Antonio Metropolitan Transit Authority, supra, 469 U.S. 528 [83 L.Ed.2d 1016, 105 S.Ct. 1005].
In Garcia, the Court rejected the constitutional interpretation of the Tenth Amendment as a limitation on the delegated powers of Congress under the commerce clause as espoused in National League of Cities. The majority concluded that the holding of National League was unmanageable on a prac *Supp. 32 tical level. It would prevent a court from “accommodating changes in the historical functions of States” and was unnecessary for the protection of state interests. (Garcia, supra, 469 U.S. at p. — [83 L.Ed.2d at pp. 1029-1031].) The majority found that the limitations on the exercise of delegated powers found in the Constitution itself and active representation of state interests by representatives in federal government through the political process would ensure that state sovereignty would not be unduly infringed by Congress in the exercise of its delegated powers. (Id., at p. — [83 L.Ed.2d at pp. 1034-1035].)
In Garcia, the specific question before the court was the propriety of the 1974 amendments to the Fair Labor Standards Act (FLSA) subjecting employees of public mass transit and virtually all state and local government employees, including the San Antonio Metropolitan Transit Authority (SAMTA), to the minimum-wage and overtime requirements of the FLSA. (See 29 U.S.C. § 203(d) and (x).) The court noted that SAMTA, as a qualifying mass-transit program under the Urban Mass Transportation Act (UMTA) (49 U.S.C. § 1601 et seq.) received approximately 75 percent of its operating expenses through federal subsidies and local sales tax. SAMTA complied with the above provisions of the FLSA until 1976 when the high court held in National League of Cities that the FLSA could not be applied constitutionally to the “traditional governmental functions” of state and local governments. (National League of Cities, supra, at p. 852 [49 L.Ed.2d at p. 258].) Four months after National League of Cities was decided, SAM-TA informed its employees that the decision relieved SAMTA of its overtime obligations under the FLSA. However, in 1979 the Wage and Hour Administration of the Department of Labor issued an opinion that SAMTA’s operations were not constitutionally immune from the application of the FLSA under National League of Cities. SAMTA filed an action against the Secretary of Labor seeking a declaratory judgment that National League of Cities precluded the application of the FLSA’s overtime requirements to SAMTA. The secretary counterclaimed for enforcement of the overtime and record-keeping requirements of the FLSA and Garcia and several employees of SAMTA filed separate suit seeking overtime pay and intervened as defendants in the action between SAMTA and the secretary.
Relying upon National League of Cities the district court granted SAM-TA’s motion for summary judgment. The Secretary and Garcia both appealed directly to the Supreme Court. During the pendency of those appeals Transportation Union v. Long Island R. Co. (1982) 455 U.S. 678 [71 L.Ed.2d 547, 102 S.Ct. 1349] was decided. In that case the court ruled that commuter rail service provided by the state-owned Long Island Railroad did not constitute a “traditional governmental function” and hence did not enjoy constitutional immunity, under National League of Cities, from the *Supp. 33 requirements of the Railway Labor Act. (Id., at p. 685 [71 L.Ed.2d at p. 553].) Based on this holding the Supreme Court in Garcia vacated the district court’s judgment and remanded for further consideration in light of Long Island. (457 U.S. 1102 [73 L.Ed.2d 1309, 102 S.Ct. 2897].) The district court adhered to its original position, finding that historically Congress had established a longstanding federal interest and regulatory presence in the railway industry in contrast to the only recent involvement of the federal government in establishing wages of public mass transit employees, and that the pattern of state regulation of mass transit gave rise to an inference of state sovereignty in the field within the meaning of National League of Cities. (San Antonio Met. Transit Authority v. Donovan (W.D.Tex. 1983) 557 F.Supp. 445.) The Secretary and Garcia again appealed to the Supreme Court.
Initially the court stated that under the summary of National League of Cities contained in Hodel v. Virginia Surface Mining & Recl. Assn. (1981) 452 U.S. 264 [69 L.Ed.2d 1, 101 S.Ct. 2352], four conditions had to be satisfied before a state activity could be deemed immune under the Tenth Amendment from a particular federal regulation under the commerce clause. “First, it is said that the federal statute at issue must regulate ‘the “States as States.’” Second, the statute must ‘address matters that are indisputably “attribute[s] of state sovereignty.” ’ Third, state compliance with the federal obligation must ‘directly impair [the States’] ability “to structure integral operations in areas of traditional governmental functions.’” [Fourth], the relation of state and federal interests must not be such that ‘the nature of the federal interest . . . justifies state submission.’ [Hodel v. Virginia Surface Mining & Recl. Assn., supra,] 452 US, at pp. 287-288, and n. 29 . . . quoting National League of Cities, 426 US, at 845, 852, 854 . . . .” (Garcia, supra, 469 U.S. 528 [83 L.Ed.2d at p. 1025].) The Supreme Court pointed out the difficulty in utilizing an historical analysis in defining the scope of the governmental functions deemed protected under National League of Cities. (Garcia, supra, 469 U.S. 528 [83 L.Ed.2d at p. 1026].) The Garcia majority believed that reliance on history as the organizing principle of state immunity under the Tenth Amendment would force the court to “decide by fiat precisely how longstanding a pattern of state involvement had to be for federal regulatory authority to be defeated” (Id., at p. — [83 L.Ed.2d at pp. 1029-1030]), and prevented a court “from accommodating changes in the historical functions of states.” (Id., at p. — [83 L.Ed.2d at p. 1029].) Indeed the court recognized that: “the existence vel non of a tradition of federal involvement in a particular area does not provide an adequate standard for state immunity. Most of the Federal Government’s current regulatory activity originated less than 50 years ago with the New Deal, and a good portion of it has developed within the last two decades. The recent vintage of this regulatory activity does not diminish the *Supp. 34 strength of the federal interest in applying regulatory standards to state activities, nor does it affect the strength of the States’ interest in being free from federal supervision.” (Id., at p. — [83 L.Ed.2d at p. 1030, fn. 10].) The court accordingly rejected National League as the standard for determining when congressional regulatory enactments under the commerce clause exceed Congress’ constitutional authority. The court stated that the Constitution as a document recognizes the dual sovereignty of the federal and state governments but in only rare exceptions, “like the guarantee, in Article IV, section 3 of state territorial integrity, . . . carve[s] out express elements of state sovereignty that Congress may not employ its delegated powers to displace.” (Id., at p. — [83 L.Ed.2d at p. 1033).) The court reasoned that the parameters of state sovereignty should therefore be found “in the shape of the constitutional scheme rather than in predetermined notions of sovereign power.” (Id., at p. — [83 L.Ed.2d at p. 1033].) The constitutional scheme as defended by the courts is one in which the principle limitations on federal authority are those “inherent in the delegated nature of Congress’ Article I powers . . . [and] the structure of the Federal Government itself.” (Id., at p. — [83 L.Ed.2d at p. 1034].) The court said; “[T]he principle and basic limit on the federal commerce power is that inherent in all congressional action—the built-in restraints that our system provides through state participation in federal governmental action. The political process ensures that laws that unduly burden the States will not be promulgated.” (Id., at p. — [83 L.Ed.2d at p. 1037].) The majority therefore envisioned state influence in Congress through popular election of members of the House of Representatives, equal representation of the states in the United States Senate, and over the Presidency by state control over electoral qualifications in presidential elections as the means relied upon by the Framers to “insulate the interest of States.” (Id., at p. — [83 L.Ed.2d at p. 1034).) The court noted that the effectiveness of the political process in preserving states’ interest is apparent in the states’ success in securing large federal appropriations for various state and local activities and in exempting themselves from a wide variety of obligations imposed by Congress under the commerce clause.
Thus, the court reasoned; “[a]ny substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a ‘sacred province of state autonomy.’” (Id., at p. — [83 L.Ed.2d at p. 1036], quoting EEOC v. Wyoming (1983) 460 U.S. 226, 236 [75 L.Ed.2d 18, 29, 103 S.Ct. 1054].) Finding that the states have secured substantial federal funding for their public mass transit systems the court concluded that Congress’ exercise of its commerce clause power had significantly enhanced state func *Supp. 35 tioning in the area and that “the internal safeguards of the political process ha[d] performed as intended.” (Id., at p. — [83 L.Ed.2d at p. 1037].)
Whether under the test of National League of Cities or the principles of Garcia it is clear that neither California’s “ability to structure integral operations in areas of traditional governmental functions” nor its autonomy in the federal system has been unduly infringed in this instance. Here, as in Garcia, state autonomy has been protected by the state’s success in securing large money grants for local highway systems. Congress also made provisions for carrying the cost of implementation on federal shoulders by placing no financial burden on the state in administering the national speed limit.
Further, the Federal-Aid Highway Act declares the federal policy that: “The authorization of the appropriation of Federal funds or their availability for expenditure under this chapter shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed. The provisions of this chapter provide for a federally assisted State program.” (23 U.S.C. § 145.)
It is apparent that the states have been successful in limiting federal regulatory authority over state and local highway systems, including the local speed laws. The federal regulation is narrowly tailored to its specific purpose to conserve the nation’s fossil fuel and does not unduly infringe upon state authority to establish speed limits on its highways. Indeed the public health and welfare of the state is enhanced by the reduced speed limit both in terms of fuel economy and reduced traffic fatalities. The type of federal intrusion into state decision making power at issue is minimal. Notably, it is not the State of California who has objected to this statute. It is not the state who complains that it has been coerced to give up its sovereignty. When California adopted the statutes currently in effect it recognized fuel conservation and safety as important purposes of the statutes. Does not California also have an interest in fuel conservation (consider the impact of fuel reserves and the need for off-shore oil drilling) or in public safety? When California, for valid reasons, chooses to adopt the national policy, is this illegal coercion? Respondent has failed to identify what state or local interest California has in a maximum speed limit above 55 miles per hour.
The trial court found that Congress lacked power to regulate motor vehicle speed on noninterstate highways under the commerce clause. Although we question the trial court’s conclusion, having found that congressional power exists under the “spending power,” we need not reach that issue. Suffice it to say that in this instance there appears to be a clear basis for Congress to have concluded that reduction in the speeds of automobile travel would conserve fuel, decrease the demand on the nation’s fossil fuel supply *Supp. 36 and improve traffic safety. The Federal Energy Administration had determined that over five million gallons of fuel had been saved daily due to reduction in speeds and travel on highways. (1974 U.S. Code Cong. & Admin. News, op. cit. supra, at p. 8019.) A 20 percent drop in traffic fatalities had also been realized. (Ibid.) The United States Supreme Court has made clear that “[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations.” (Fry v. U.S. (1975) 421 U.S. 542, 547 [44 L.Ed.2d 363, 368, 95 S.Ct. 1792].) Similarly the combined effect of individuals operating motor vehicles upon intrastate highways has a significant effect on the nation’s fuel consumption. Regulation of motor vehicle speed is a reasonable method of controlling these national problems. Notwithstanding the fact that local land use was a matter traditionally of local concern, the court determined that Congress had a rational basis for its conclusion that surface coal mining, with its concomitant environmental hazards throughout the nation and effect on the economy, affected interstate commerce. (Model v. Virginia Surface Mining & Recl. Assn., supra, 452 U.S. at pp. 277-282 [69 L.Ed.2d at pp. 16-20, 101 S.Ct. 2352]; see Friends of Earth v. Carey (2d Cir. 1977) 552 F.2d 25.)
Conclusion
For the reasons stated above we find the provisions of section 154 of title 23 of the United States Code (the Emergency Highway Energy Conservation Act. [Pub. L. No. 93-239, 87 Stat. 1046]), are an appropriate exercise of Congress’ authority under the spending clause, that this authority is not limited by the Tenth Amendment, and that the California Legislature did not impermissibly delegate its legislative power in adopting a 55-mile-per-hour speed limit. The judgment of the trial court is therefore reversed.
Phillips, I., and Leach, J., concurred.

“Highway” is defined to include “roads, streets, and parkways [as well as] rights-of-way, bridges, railroad-highway crossings, tunnels, drainage structures, signs, guardrails, and protective structures, in connection with highways.” (23 U.S.C. § 101.)

Title 23, section 106 authorizes the secretary to grant federal highway aid to states submitting programs for funding.