2022 IL App (1st) 200598

FIFTH DIVISION
JUNE 17, 2022

No. 1-20-0598

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 12063 |
| | ) | |
| ADAM GRUNIN, | ) | Honorable |
| | ) | Joseph Michael Cataldo, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Cook County, the defendant-appellant, Adam Grunin, was found guilty of reckless homicide (720 ILCS 5/9-3(a) (West 2018)) and two counts of aggravated reckless driving (625 ILCS 5/11-503(a)(1), (c) (West 2018)). The circuit court merged the aggravated reckless driving convictions with the reckless homicide conviction. The circuit court imposed concurrent sentences of four years' imprisonment for reckless homicide, which merged with the three-year sentence for aggravated reckless driving. On appeal, Mr. Grunin contends that the State failed to prove him guilty beyond a reasonable doubt when "unrebutted evidence" established that he suffered a focal seizure with loss of awareness prior to hitting the victims' vehicle. Upon considering a petition for rehearing by Mr. Grunin and the response by the State, we again affirm the judgment of the circuit court of Cook County.

¶ 2                              BACKGROUND

¶ 3     On August 28, 2018, Mr. Grunin was charged with reckless homicide and aggravated reckless driving following a motor vehicle collision on July 21, 2018, which caused the death of Alyssa Lendino and injured Tony Lendino and Amanda Lendino.[1] On January 7, 2020, a jury trial commenced. The evidence at trial established that on July 21, 2018, Mr. Grunin, who was driving a white Hyundai Sonata, was involved in two motor vehicle collisions. The first collision involved Angelica Brito's black Hyundai, and the second involved the Lendino's silver Chevrolet Equinox.

¶ 4     Ms. Brito testified that on the afternoon of July 21, 2018, she was driving southbound in the left lane of Milwaukee Avenue in Wheeling, Illinois, with her two children in the back seat. Suddenly, another vehicle hit the rear driver's side of her vehicle. The vehicle that hit her then passed her on the driver's side "[w]ithin seconds." During cross-examination, Ms. Brito acknowledged that she did not see inside the vehicle that hit her and only saw its movements "in the direction it traveled."

¶ 5     Margaret Molitor, who was also driving southbound on Milwaukee Avenue at the same time on that day, testified that she changed lanes after seeing a white vehicle "coming fast" in her rearview mirror. The white vehicle hit a black vehicle, swerved, and then continued driving without slowing. Ms. Molitor could see that the white vehicle was being driven by a man who was looking forward with his hands on the wheel.

¶ 6     Linda Hawkins, who was traveling northbound on Milwaukee Avenue just past the intersection with Hintz Road, at the same time, testified that she saw a white vehicle approach, "swerve a little," and then "straighten out." The vehicle was traveling "very fast," and its front end was "wobbling." Ms. Hawkins watched in her side mirror, as the white vehicle passed her, and

---

[1] For clarity, we will refer to the members of the Lendino family by their given names.

then she observed the white vehicle crash into another vehicle. The white vehicle did not decelerate nor change lanes. During cross-examination, Ms. Hawkins did not remember telling police officers that the white vehicle swerved or that the driver lacked control. However, she told officers that she did not see the white vehicle's brake lights activate prior to the collision.

¶ 7        Shaniqua Silva testified that she was in the back seat of a vehicle traveling southbound on Milwaukee Avenue when a black vehicle almost struck the back of the vehicle that she was in. As Ms. Silva looked back, the black vehicle "stall[ed] out" and hit a curb. She next saw a white vehicle "fly up" from behind, straddling the left lane and median. The driver, a "heavier set" white man with one hand on the steering wheel, looked right and then toward his rearview mirror. The vehicle was traveling approximately 100 miles per hour and smoke was coming from its front. During cross-examination, Ms. Silva acknowledged that she may have told a police officer that the driver had his right hand on the steering wheel and that he looked to his left and then to the rearview mirror.

¶ 8        Michele Lendino testified that on the afternoon of July 21, 2018, she was driving her silver Chevrolet Equinox and stopped at a red light at the intersection of Milwaukee Avenue and Hintz Road. Her husband, Tony, was in the front passenger seat, her daughter, Amanda was behind Michele, and her other daughter, Alyssa, was sitting behind Tony. Michele then heard "the most horrible sound," and her vehicle began spinning. When the vehicle stopped, she kicked open a door, exited, and screamed for help. Michelle suffered facial lacerations, and the entire family was taken to a hospital.

¶ 9        The State entered stipulations that the emergency room physician who treated Tony would testify that he suffered fractures to three areas of the lower spine and four left ribs and an injury to his spleen. The emergency room physician, who treated Amanda, would testify that she suffered

fractures to her left clavicle, right tibia, pelvis, and vertebral endplate in her spine, and a laceration to her left leg. Later in the trial, an assistant medical examiner testified that Alyssa's autopsy revealed lacerations, abrasions, bruising, a fracture to her left femur, a collapsed lung, a lacerated spleen, a subdural hemorrhage, and cerebral edema and that her cause of death was multiple injuries due to a motor vehicle collision.

¶ 10    Joseph Kasper testified that on July 21, 2018, he was about to stop his delivery van at the intersection of Milwaukee Avenue and Hintz Road when he saw three vehicles colliding. He called 911 and tried to help the "mom" who exited one of the vehicles after the accident. His vehicle was equipped with a camera that filmed the accident. The video of the accident, which was admitted into evidence and published to the jury without objection, is included in the record on appeal. The video showed a white vehicle hitting a light-colored vehicle stopped at a red light, pushing the light-colored vehicle into the intersection and causing it to collide with a black truck.

¶ 11    Radoslaw Swiecicki testified that, on the same day, he was approaching the intersection of Milwaukee Avenue and Hintz Road when a white vehicle passed "extremely fast" and hit another vehicle. The white vehicle did not change lanes, decelerate, or brake but "went straight." After calling 911, Mr. Swiecicki opened the white vehicle's door, saw that the driver was "okay," and left without talking to the driver. At trial, Mr. Swiecicki identified Mr. Grunin as the driver of the white vehicle.

¶ 12    Wheeling police officer Rick Richardson testified that when he arrived at the intersection of Milwaukee Avenue and Hintz Road, he observed that the driver of the white vehicle, who was still seated in the vehicle, had a laceration over his eye and a bloody face. At trial, Officer Richardson identified Mr. Grunin as the driver of the white vehicle. Officer Richardson accompanied Mr. Grunin to a hospital in an ambulance. Mr. Grunin related his name, address,

place of employment, and the date but was confused and did not remember the accident, saying, "let me guess, I fell asleep." Mr. Grunin stated he had worked from 11 p.m. to 7 a.m. the previous day and was tired. He said that his mother had told him to nap at his grandparents' house. He also stated that he had to pack for a trip to San Diego.

¶ 13    The following day, Officer Richardson obtained video footage from a liquor store of traffic on Milwaukee Avenue at the time of the collision. The video footage was published to the jury and was included in the record on appeal. The video footage showed vehicles traveling on Milwaukee Avenue, including a white vehicle moving very fast. When the video was played for the jury, Officer Richardson identified the vehicles of the defendant, Mr. Grunin, and the Lendino family.

¶ 14    During cross-examination, Officer Richardson testified that, at the hospital, Mr. Grunin stated that he had epilepsy and took antiseizure medication. Tests conducted on Mr. Grunin's urine and blood were negative for "illegal substances," and no alcohol or illegal drugs were recovered from Mr. Grunin's vehicle. Prescription antiseizure medication was found inside Mr. Grunin's vehicle. Cell phone records did not indicate that Mr. Grunin was talking or texting at the time of the collision. Officer Richardson later learned that the address Mr. Grunin related in the ambulance was not his current address, nor was his description of his travel plans accurate. Mr. Grunin was traveling to San Francisco rather than San Diego as he had stated and he had not lived at the stated address for several years. At the scene, Officer Richardson spoke with Ms. Silva and again later in greater depth. His report indicated that she stated that Mr. Grunin looked to the left and then into the rearview mirror.

¶ 15    Wheeling police sergeant Paul Hardt testified that on September 29, 2018, he was asked to videotape a route of travel southbound on Milwaukee Avenue as part of the investigation in this

case. He filmed the route on a Saturday at 2 p.m. This video was admitted into evidence and published to the jury and is included in the record on appeal. It shows a route of travel that includes a curve in the road.

¶ 16     Park Ridge police sergeant Kirk Ashleman testified that he was trained in accident collision reconstruction, had worked in the field for approximately 20 years, and previously testified as an expert in accident collision reconstruction. Sergeant Ashleman knew defense expert Roger Barrette and reviewed Mr. Barrette's report in this case.

¶ 17     When Sergeant Ashleman arrived at the accident scene, he observed two vehicles, debris in the intersection, "road scars" in the southbound Milwaukee Avenue lanes, and postcollision tire marks. Sergeant Ashleman determined that following the collision of the two vehicles, the vehicles traveled 280 to 290 feet from the point of impact to "final rest." Based on the distance traveled after impact, the impact speed was "very fast" and exceeded "highway speed." As the vehicles came to final rest, they collided with a truck and would have traveled farther without that contact. Sergeant Ashleman also received information about another crash involving the white vehicle that occurred approximately six-tenths of a mile or 3132 feet away. The configuration of the road between the two crash sites was "fairly straight," with one "slight curvature" to the southeast on Milwaukee Avenue.

¶ 18     The Lendino's Chevrolet Equinox and Mr. Grunin's Hyundai were equipped with airbag control modules (ACM) that record data before, during, and after a collision. When a vehicle is started, it runs a diagnostic check on the restraint system and data is constantly entered into the ACM. When the ACM "sense[s]" a severe collision, it will record and store that data, including five seconds of precrash data. Sergeant Ashleman used this data to determine that, five seconds before impact, Mr. Grunin's vehicle was traveling at 100.6 miles per hour, and right before the

impact, it was traveling at 107.5 miles per hour. This data also indicated that the throttle of Mr. Grunin's vehicle, which opens as the accelerator is pushed, was open at 63% five seconds prior to impact, then closed slightly before opening to 74% at impact. Throttle percentage correlates to pressure on the accelerator, and this data indicated that pressure on the accelerator was eased and then increased. This fluctuation led Sergeant Ashleman to conclude that Mr. Grunin was controlling the vehicle. However, the data did not show brake usage.

¶ 19    The ACM records steering in five-degree increments, and unless the wheel is turned more than five degrees, the system records a zero reading. Here, for the five seconds prior to impact, the steering degree for Mr. Grunin's vehicle was recorded as zero. Sergeant Ashleman's review of the videos and still photographs from those videos did not show veering, although minor corrections made to maintain a straight path would comport with a zero reading. Sergeant Ashleman testified that this indicated that Mr. Grunin, as the driver, was exerting "steering input." Sergeant Ashleman also opined that Mr. Grunin had to exert control on the wheel for the vehicle to travel as it did. This resulted in the subsequent impact being "full-centered" because Mr. Grunin did not change lanes.

¶ 20    During cross-examination, Sergeant Ashleman acknowledged that, after reviewing Mr. Barrette's report, he told the State that Mr. Grunin exerted some degree of control over steering and acceleration. Sergeant Ashleman concluded that Mr. Grunin stayed in the same lane of traffic because he exerted steering control, which reflected the road's configuration and crown, as well as the vehicle's front-end alignment, the effect of the prior accident, uneven wear on the tires, and tire pressure. A fail-safe mechanism is attached to a throttle, but Sergeant Ashleman did not review any evidence pertaining to that mechanism. Although the throttle data indicated that Mr. Grunin's foot was moving back and forth, it did not indicate whether the movement was jerking or smooth.

Sergeant Ashleman also performed a "time-distance" analysis to show the two vehicles' locations five seconds before the collision. In the last five seconds before impact, Mr. Grunin's vehicle traveled 764 feet and the Lendino's vehicle traveled 191 feet.

¶ 21    The State then rested. The defense presented Roger Barrette, as an expert witness. He has worked as an accident collision reconstruction specialist since 1986 and has also taught and published in the field. For this case, Mr. Barrette reviewed police records, videos, and photographs, and completed a "situationally complete reconstruction" of the collision. He also performed calculations to validate the ACM data and concluded the ACM reports were accurate. He completed time-distance and speed analyses as well. He explained that reconstructions are done to validate the reports' contents and noted that Sergeant Ashleman did not perform a speed analysis.

¶ 22    Mr. Barrette opined that a driver's foot moving back and forth, or twitching, could account for the fluctuation in throttle reflected in Mr. Grunin's vehicle's ACM report. He disagreed with Sergeant Ashleman's conclusion that Mr. Grunin maintained steering control, as it was unknown what "would cause the vehicle to stray off of its straight path." Vehicles designed in the United States have self-aligning torque, so that when a driver releases the steering wheel, the vehicle "goes straight."[2] "[N]o evidence" indicated "intentional driver control," and there were paths in the approach to the intersection of Milwaukee Avenue and Hintz Road that Mr. Grunin could have used to avoid the collision. While Mr. Barrette agreed there was driver control during the first collision, he opined there was none in the five seconds preceding the second collision and no data indicated "intentional driver input" to avoid the collision.

---

[2]Defense counsel further inquired whether Mr. Grunin's particular Hyundai had self-aligning torque. Mr. Barrette responded, "Every vehicle designed has that feature."

¶ 23    During cross-examination, Mr. Barrette testified that his reconstruction was consistent with the ACM data. He calculated the distance between the first and second accidents as 3120 feet compared to Sergeant Ashleman's 3200 feet and the time at 27 seconds as opposed to Sergeant Ashleman's 29 seconds. Mr. Barrette stated that, in his experience, around 25% of the event data recorders he examined indicated no braking in the five seconds prior to impact and "about half of the time" there was no steering input. Failure to brake could reflect driver distraction, and the maneuvering ability of a driver going 100 miles per hour was different than that of a driver going 10 miles per hour.

¶ 24    Mr. Barrette did not know whether Mr. Grunin attempted to brake or turn before the first accident or whether Mr. Grunin was distracted. On cross-examination, he acknowledged that Mr. Grunin's actions in failing to stop at the first accident, going around that vehicle, looking in the mirror, and accelerating were consistent with exerting control. Mr. Barrette had no knowledge of Mr. Grunin's degree of attention or actions inside the vehicle but stated that a vehicle could travel straight without steering input when the "net effect" of the forces affecting the vehicle did not push it off a straight path. Mr. Barrette attested that Mr. Grunin's vehicle could have traveled straight without his hands on the wheel because, after the bend in the road near the scene of the first accident, the road was straight to the location of the second collision. Additionally, the fluctuation in throttle may or may not have been caused by driver control.

¶ 25    During redirect examination, Mr. Barrette testified that there was evidence of driver control after the first collision but that hands on a steering wheel did not necessarily demonstrate control; rather, there could be unintentional control. He also testified that he had never previously reviewed a report that showed one vehicle approaching another at 100 miles per hour that did not also show braking or steering.

¶ 26    Dr. Andres Kanner, a board-certified neurologist, testified as a defense expert witness. He heads the epilepsy program at the University of Miami School of Medicine and has lectured and published in the field of epilepsy. Dr. Kanner described the human brain as a computer and epilepsy as "short circuits" in the brain. Following an epileptic seizure, a person experiences a "postictal confusional state" as the brain "reboot[s]." Seizures in the temporal lobe may result in loss of awareness, motionless staring, "purposeless" movement of the hands, and stiffness. Additional manifestations of a seizure include repeated blinking or side-to-side movement of the eyes, lack of movement in the limbs and body, tremors, twitching, and jerking, such that the person loses the ability to control his body. Dr. Kanner further explained that once a person is diagnosed with epilepsy and medicated, he may continue to have "limited short circuits" with loss of awareness. Some people remain unaware of their seizures until witnesses alert them. Medication does not completely prevent the seizures from occurring.

¶ 27    Dr. Kanner reviewed Mr. Grunin's medical records from his treating physicians, including those from neurologist Dr. Jessie Taber[3] and internist Dr. Robert Maslew. He opined that Mr. Grunin's short circuits were localized in the temporal lobe of his brain, which rendered Mr. Grunin unaware of events during his seizures. Dr. Kanner also reviewed Mr. Barrette's report, witness statements, and police reports. He noted that emergency medical technicians (EMTs) found Mr. Grunin to be confused and with no recollection of the accident. Mr. Grunin's inability to describe events leading up to the accident and lack of knowledge about it were "classic" symptoms of an epileptic seizure. Although Mr. Grunin related his name in the ambulance, he was unable to give

---

[3]Dr. Jessie Taber's first and last names are spelled various ways throughout the report of proceedings. Throughout this opinion, we will use the spelling "Dr. Jessie Taber" or "Dr. Taber."

his accurate address, work schedule, or travel destination. Mr. Grunin also told paramedics that he was tired, and his medical records revealed that one of his seizure symptoms was fatigue.

¶ 28    Dr. Kanner noted that emergency room records indicated that Mr. Grunin had a "significant history" of epilepsy and was taking medications commonly prescribed to people with epilepsy. At the hospital, Mr. Grunin underwent a CT scan, but not an electroencephalography (EEG) test, which is used to measure electrical activity in the brain. The treating physician's notes revealed that Mr. Grunin reported a loss of consciousness and no memory of the accident, but no head pain. Dr. Kanner opined that a lack of head pain meant that Mr. Grunin was not concussed, which left a seizure as the only explanation for his confusion. Based upon Mr. Grunin's statement that he was tired, Dr. Kanner suggested that he may have had multiple seizures on the day of the accident. Although Mr. Grunin denied having recent seizures while being treated in the emergency room after the accident, Dr. Kanner believed that Mr. Grunin "probably" had more frequent seizures than he realized and that no one observed them because he lived alone and worked at night.

¶ 29    Mr. Grunin's medical records included a December 10, 2018, e-mail from Mr. Grunin to his treating neurologist stating that on December 9, 2018, his mother observed him in a "daze" or "staring spell" for 30 to 40 seconds and that he did not remember anything from that time period. In the response, the neurologist stated that it sounded as though Mr. Grunin had a seizure. Dr. Kanner noted that Mr. Grunin received a driving restriction in 2010 after a seizure but was not under a driving restriction when the accident occurred.

¶ 30    Dr. Kanner opined that Mr. Grunin followed his physicians' orders. Mr. Grunin visited Dr. Maslew's office on January 19, 2006, due to a sleep disorder and seizure, resulting in an EEG, bloodwork, and an adjustment to his antiepileptic medication. A September 10, 2010, note by Dr. Taber stated that although Mr. Grunin had an abnormal EEG in 2003, his results were normal in

2005 and 2008, and Mr. Grunin's last seizure convulsion was in early September 2010. On April 7, 2017, Dr. Taber diagnosed Mr. Grunin with "focal epilepsy with dyscognitive seizures," noted Mr. Grunin was experiencing "staring episodes," and considered adding a second antiseizure medication.

¶ 31 On June 15, 2018, following an episode of confusion, Dr. Taber increased the dosage of Mr. Grunin's medication and ordered an EEG, which showed abnormal electrical activity in the temporal lobe of Mr. Grunin's brain. Dr. Kanner interpreted this EEG to mean that Mr. Grunin was experiencing seizures. Dr. Kanner reached this conclusion even though Mr. Grunin had denied having seizures. The medical records indicated that Mr. Grunin's boss brought a staring spell to Mr. Grunin's attention. An EEG administered on July 5, 2018, was abnormal, but no driving restriction was imposed upon Mr. Grunin.

¶ 32 Dr. Kanner explained that if Mr. Grunin's foot was on the gas pedal before a seizure, it was not "unlikely" that his foot would continue to push on the pedal as the seizure began and he stared motionless. Dr. Kanner opined that the increase in speed between the first accident and the second "has to be explained" by Mr. Grunin's foot "continuously" pushing on the gas pedal and that Mr. Grunin was unaware of his "automatic behavior." Dr. Kanner also testified to the following possibilities: (1) Mr. Grunin had a seizure during the first accident; (2) the stress of the first accident triggered a seizure; or (3) the seizure began during the first accident and continued until the second accident.

¶ 33 Dr. Kanner found it significant that Mr. Grunin did not veer before the crash because, in his opinion, normal human "survival instinct" would cause a person to avoid an obvious obstacle such as a collision. As no evidence suggested that Mr. Grunin was suicidal or distracted while driving, the "only other explanation" for Mr. Grunin driving directly into the Lendino's vehicle at

such a high rate of speed, was that he was unaware of his actions. Dr. Kanner concluded that, based upon the totality of the circumstances, it was his opinion, to a reasonable degree of medical certainty, that Mr. Grunin's collision with the Lendino family's vehicle was the result of a seizure and that he could not control his body.

¶ 34    During cross-examination, Dr. Kanner acknowledged that he was not Mr. Grunin's treating physician, had not conducted a clinical interview of Mr. Grunin, and was paid $15,000 for his expert consultation in the case. Nevertheless, he reiterated his opinion that Mr. Grunin suffered a focal epileptic seizure with loss of awareness after the first collision but before the second collision. Although it was difficult to establish "objectively" exactly when the seizure happened because no one witnessed it, Dr. Kanner believed the seizure occurred "within [the] period of time [of the accident]." Dr. Kanner could not "completely" rule out that the seizure occurred before the first crash. It was also possible that Mr. Grunin struck the first vehicle, experienced a seizure, and then maneuvered into the correct lane because he only had a partial loss of awareness or acted "reflexively." However, as the seizure progressed, Mr. Grunin would have lost "full awareness" of his surroundings.

¶ 35    Dr. Kanner testified that he was "trying to make sense" of the accident but that no one knew for sure what happened during the initial collision. He also testified that nothing suggested that Mr. Grunin did not have a seizure. During cross-examination, he agreed that speeding could be volitional when a person has "full awareness," but evidence that Mr. Grunin looked toward the rearview mirror did not establish that his conduct was volitional because a person can look around during a seizure without that action being volitional. Dr. Kanner considered the possibility that striking a vehicle, driving around it, and looking in the mirror might have meant Mr. Grunin was not having a seizure but ruled it out. Dr. Kanner opined that a person having a focal seizure that

manifested through "motionless steering with a lack of movement of the wheel" could drive without swerving for 3100 feet or could veer off the road.

¶ 36     Dr. Kanner was aware that Mr. Grunin did not tell the emergency room physicians or his treating physicians that he may have had a seizure during the crash. It was not until December 2018 that Mr. Grunin told his physicians about a seizure that may have occurred the day prior to the collision. On May 8, 2019, when Dr. Taber asked Mr. Grunin about the crash, Mr. Grunin stated that he: was tired and probably should have gone to sleep rather than travel; did not think he missed his medication; and remembered turning onto Milwaukee Avenue and then being transported in an ambulance. Mr. Grunin's medical records did not state that he experienced a seizure on the day of the crash. Although Dr. Kanner did not speak with Dr. Taber, he "[a]bsolutely" believed that Mr. Grunin had a seizure.

¶ 37     During redirect examination, Dr. Kanner further stated his belief that Mr. Grunin was not exaggerating or feigning his symptoms. He noted that from the "beginning" of the ambulance ride, Mr. Grunin was confused, disorientated, and unaware of the accident. The fact that Mr. Grunin did not remember the accident and gave incorrect answers to basic questions "made no sense." Moreover, in the past, Mr. Grunin was aware of his seizures only because others observed them.

¶ 38     During recross-examination, Dr. Kanner acknowledged that on June 15, 2018, Mr. Grunin visited Dr. Taber and reported a staring spell, and Dr. Taber treated him for a seizure. In December 2018, Mr. Grunin contacted Dr. Taber again, and Dr. Taber noted that Mr. Grunin had a seizure. Dr. Taber's notes did not state that Mr. Grunin had a seizure on July 21, 2018. During re-redirect examination, Dr. Kanner testified that Mr. Grunin only reported seizures after being told about them. That further supported his opinion that Mr. Grunin was unaware of when he had a seizure.

¶ 39    In rebuttal to Dr. Kanner's testimony that Mr. Grunin had suffered a seizure, the State presented Northbrook firefighter-paramedic Thomas Longaker, who testified that he responded to the accident and treated Mr. Grunin on July 21, 2018. Mr. Grunin was alert but confused, had a laceration over his eye, and complained of wrist pain. Mr. Grunin was not sleeping, twitching, or convulsing. Mr. Longaker rated Mr. Grunin's awareness at the time as being a three on a scale of four. Mr. Grunin was aware of his surroundings but not the events leading up to the accident. He provided his name and date of birth, but at times his speech was "confused," which Mr. Longaker said was consistent with a head injury. Nothing indicated to Mr. Longaker that Mr. Grunin had a seizure, and Mr. Grunin did not report one.

¶ 40    During cross-examination, Mr. Longaker testified that Mr. Grunin indicated that he lived in Glenview. Mr. Longaker was unaware that Mr. Grunin did not live in Glenview and had lived elsewhere for seven years prior to the accident. Mr. Grunin also stated that he was going to visit his mother on a naval base, although she did not live on a naval base. Mr. Grunin was in and out of consciousness, which was not consistent with a seizure in Mr. Longaker's experience. Although Mr. Longaker acknowledged that he did not attend medical school, he testified that he spoke to a neurologist about seizures during his EMT/paramedic training. He also acknowledged that he was not trained to detect focal seizures and agreed that Mr. Grunin not remembering the accident could be consistent with a seizure.

¶ 41    Dr. Lindsay Jin, who treated Mr. Grunin in the emergency room on July 21, 2018, testified that Mr. Grunin was admitted to the hospital after the accident due to an elevated heartrate and dizziness. Mr. Grunin answered questions and was oriented to his identity and location, and Dr. Jin had no difficulty communicating with him. Mr. Grunin did not provide details of the accident to Dr. Jin but was not "confused in a normal conversation." Mr. Grunin reported a history of

epilepsy and that his last seizure occurred at 15 years of age but did not say that he may have had a seizure that day. Dr. Jin did not observe any indication that Mr. Grunin suffered a seizure. During cross-examination, Dr. Jin acknowledged that confusion can be consistent with a seizure and that a person can have a seizure and not know it.

¶ 42    In closing argument, the State asserted that Mr. Grunin acted recklessly when he fled the first crash and looked back as he sped away at 107 miles per hour. The defense responded that Mr. Grunin did not stop at the scene of the first "fender bender" due to a seizure. In rebuttal, the State argued that a driver who lost consciousness could not drive around another vehicle, enter the "appropriate lane," avoid other vehicles, and look behind him. The State further noted that Mr. Grunin, who self-reported a "staring spell," said nothing about a possible seizure on the day of the accident.

¶ 43    On January 10, 2020, the jury found Mr. Grunin guilty of one count of reckless homicide and two counts of aggravated reckless driving. Mr. Grunin filed a motion for a new trial alleging, in relevant part, that he was not proven guilty beyond a reasonable doubt when the only "rational explanation" for the accident was a focal seizure. The trial court denied the motion, noting, in pertinent part, that the jury "clearly" did not find Dr. Kanner persuasive.

¶ 44    On March 4, 2020, following a sentencing hearing, the trial court merged the aggravated reckless driving counts into the reckless homicide count and sentenced Mr. Grunin to four years in prison. The State agreed with the court that the aggravated reckless driving counts "would merge" but posited that the court had to impose sentence on those counts. The court replied that three years was "the sentence as to those." Mr. Grunin's mittimus states that Mr. Grunin received concurrent terms of four years in prison for reckless homicide and three years for each aggravated

reckless driving conviction, and, that the aggravated reckless driving convictions merged into the reckless homicide conviction. On March 30, 2020, Mr. Grunin filed a notice of appeal.

¶ 45                                    ANALYSIS

¶ 46    We note that we have jurisdiction to consider this matter, as Mr. Grunin filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017).

¶ 47    Upon petitioning this court for rehearing, we note that the attorneys for Mr. Grunin took umbrage at our issuance of the opinion in this case without conducting oral arguments. Initially, the parties requested oral arguments in this case, which this court granted and set for March 1, 2022. On January 27, 2022, Mr. Grunin's attorney filed a motion asking this court to postpone oral arguments for an unreasonably lengthy amount of time, requesting a date around after late May 2022. This Court granted the motion to remove the case from the oral argument schedule, to be postponed indefinitely. During the postponement, this court deliberated and decided unanimously that oral arguments were not necessary and would not significantly add to the resolution of the case.  See *United States v. Salinas-Garza*, 811 F.2d 272, 273 (5th Cir 1987) (stating while the case was originally set for oral argument "prior thereto the oral argument panel after due consideration unanimously came to the conclusion that oral argument would not be of significant benefit in the decisional process of this case because the facts and appropriate legal arguments were fully contained in the briefs and the record of this case.") Accordingly, in the case before us, this court decided to proceed without oral arguments and issued the original opinion on March 25, 2022. The decision to resolve a case without oral argument is within the province of the court. See Ill. S. Ct. R. 352(a) ("After the briefs have been filed, the court may dispose of any case without oral argument, if no substantial question is presented.") Moreover, it is not unique for this court to issue

opinions without oral argument. See, *e.g.*, *People v. Ortega*, 2021 IL App (1st) 182396, ¶ 6, fn. 1; *People v. Padilla*, 2021 IL App (1st) 171632, ¶ 3, fn. 1.

¶ 48　　On appeal, both initially and in his petition for rehearing, Mr. Grunin contends that he was not proven guilty beyond a reasonable doubt of reckless homicide or aggravated reckless driving. He argues that unrebutted evidence established that he suffered a focal seizure with loss of awareness before striking the Lendino's vehicle. He asserts that his failure to brake or veer before the collision can only be explained by a loss of awareness and, therefore, the evidence was insufficient to establish that he acted recklessly by consciously disregarding a risk.

¶ 49　　When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *Id.* "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id.* A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates *a reasonable doubt of his guilt*. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 50　　To prove Mr. Grunin guilty of reckless homicide, as charged, the State had to show that, while driving a motor vehicle, Mr. Grunin unintentionally and without lawful justification recklessly performed acts, whether lawful or unlawful, that were likely to cause death or great bodily harm to a person, and those acts—specifically, exceeding the posted speed limit and failing to reduce speed to avoid an accident—caused Alyssa Lendino's death. 720 ILCS 5/9-3(a) (West

2018). To prove Mr. Grunin guilty of aggravated reckless driving as charged, the State had to show that Mr. Grunin drove a motor vehicle with a willful or wanton disregard for the safety of persons, which resulted in great bodily harm to Tony Lendino and Amanda Lendino. 625 ILCS 5/11-503(a)(1), (c) (West 2018).

¶ 51 A person acts recklessly "when he *consciously* disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to some individual and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Emphasis added.) *People v. Barham*, 337 Ill. App. 3d 1121, 1127 (2003); see also 720 ILCS 5/4-6 (West 2018). "Recklessness may be inferred from all the facts and circumstances in the record and may be established by evidence of the physical condition of the driver and his manner of operating the vehicle." *Barham*, 337 Ill. App. 3d at 1127. "Whether the given conduct is reckless is a question of fact for the jury to decide." *People v. Zator*, 209 Ill. App. 3d 322, 331 (1991).

¶ 52 Although evidence of excessive speed alone is insufficient to sustain a conviction for reckless homicide, excessive speed suffices when combined with other circumstances which indicate a *conscious* disregard of a substantial risk likely to cause death or great bodily harm to others such that a reasonable person would have acted differently under the same circumstances. *Barham*, 337 Ill. App. 3d at 1130. "[I]n finding the evidence sufficient to support a reckless homicide conviction, courts have focused on such factors as driving while intoxicated, driving at an excessive speed, disobeying traffic signals or lane markings, and fleeing the scene of the accident." *People v. Eubanks*, 2019 IL 123525, ¶ 78 (collecting cases). "When there is *excessive speed* *** in a nonemergency situation that causes the death of another person, it is unlikely there would not be other circumstances sufficient to show that the defendant consciously disregarded a

substantial and unjustifiable risk" and that such disregard grossly deviated from the standard of care that would be exercised by a reasonable person in the same circumstances. (Emphasis in original.) *People v. Mancinelli*, 232 Ill. App. 3d 211, 217 (1992).

¶ 53    Here, the evidence taken in the light most favorable to the State was sufficient to prove Mr. Grunin guilty of reckless homicide and aggravated reckless driving. Specifically, the evidence established that after colliding with Ms. Brito's vehicle, Mr. Grunin's vehicle swerved, then straightened and continued driving along Milwaukee Avenue. In the next 27 to 29 seconds, Mr. Grunin's vehicle covered approximately six-tenths of a mile at more than 100 miles per hour before colliding, in a centered impact, with the Lendino's vehicle, which was stopped at a red light. No evidence showed that Mr. Grunin's vehicle braked or veered to avoid the collision. See *People v. Moreno*, 116 Ill. App. 3d 1, 3-4 (1983) (reckless homicide conviction affirmed where the defendant was moving "well in excess" of the speed limit, was in the wrong lane, and failed to apply his brakes at the moment of impact); see also *People v. Boyle*, 78 Ill. App. 3d 791, 797-98 (1979) (rejecting the defendant's argument that he was not "criminally liable" for reckless driving because he only sped for the two blocks prior to the collision when his conscious disregard was "indicate[d]" by "excessive speed plus failure to keep a proper lookout"). The State's evidence showed not only that Mr. Grunin was speeding, collided with Ms. Brito's vehicle, and continued driving, but that he, thereafter, accelerated to more than 100 miles per hour and failed to reduce his speed or veer to avoid colliding with the Lendino's vehicle, which was stopped at a red light.

¶ 54    Sergeant Ashleman, the State's accident collision reconstruction expert, testified that data from Mr. Grunin's vehicle established that in the five seconds prior to impact with the Lendino's vehicle, Mr. Grunin's vehicle accelerated from 100.6 miles per hour to 107.5 miles per hour and that the throttle closed slightly before opening again. It was his opinion that Mr. Grunin controlled

the vehicle immediately prior to impact. Sergeant Ashleman further opined that because Mr. Grunin's vehicle did not veer before the collision, Mr. Grunin exerted "steering input." Considering this evidence, we cannot say that *no* rational trier of fact could have found Mr. Grunin guilty of reckless homicide and aggravated reckless driving under these facts. *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 55    The defense, on the other hand, presented accident collision reconstruction expert Mr. Roger Barrette and Dr. Andres Kanner, a board-certified neurologist with expertise in epilepsy, in support of its theory that Mr. Grunin was not in control of the vehicle immediately prior to the collision. Mr. Barrette testified that a driver's foot twitching or moving back and forth could explain the throttle fluctuation and that vehicles designed in the United States are designed with self-aligning torque such that when a driver releases the steering wheel, the vehicle still continues straight. Dr. Kanner testified that it was his opinion, to a reasonable degree of medical certainty, that Mr. Grunin suffered a seizure immediately prior to the collision with the Lendino's vehicle. Dr. Kanner also opined that because normal human "survival instinct" would not permit a person to drive into another vehicle at over 100 miles per hour without trying to avoid a collision and since no evidence suggested that Mr. Grunin was suicidal, the only explanation was that Mr. Grunin was unaware of his actions during the crash because he suffered a seizure.

¶ 56    Dr. Kanner acknowledged that Mr. Grunin's medical records did not indicate he suffered a seizure on that day and that it was difficult to "objectively" establish when the seizure occurred because Mr. Grunin only became aware of his seizures when others observed them. Dr. Kanner explained that it was possible that Mr. Grunin had a seizure during the first accident, that the stress of the first accident triggered a seizure, or that the seizure began during the first accident and continued until the second collision. That is, Mr. Grunin could have been in control at the time of

the first accident and able to maneuver his vehicle, if the seizure occurred after the first collision and he only suffered a partial loss of awareness or acted on reflex but lost all awareness by the time of the second collision. Dr. Kanner also testified that he could not rule out that the seizure occurred before the first crash.

¶ 57    Here, the jury was presented with two versions of the events leading to Mr. Grunin's collision with the Lendino's vehicle—either Mr. Grunin controlled the vehicle during the collision, or he did not. Considering its verdicts, the jury did not find Mr. Grunin's version of events credible. See *People v. Bradford*, 2016 IL 118674, ¶ 12 ("It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts."). While Mr. Grunin provided a plausible explanation for his failure to brake or otherwise avoid the collision, specifically that he suffered a focal seizure with lack of awareness, Dr. Kanner could not definitively say when the seizure began. A trier of fact need not seek all possible explanations consistent with innocence and raise them to the level of reasonable doubt. See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 58    Mr. Grunin argues that Dr. Kanner's unrebutted opinion, made with a "reasonable degree of medical certainty," that Mr. Grunin suffered a focal seizure prior to the collision is the *only* explanation for his failure to brake or otherwise avoid the Lendino's vehicle. He points out that Dr. Kanner found no evidence that he was suicidal and that his symptoms after the crash, including confusion, disorientation, and drowsiness, indicated an epileptic seizure. Since Dr. Kanner is an expert in epilepsy, Mr. Grunin posits that no rational trier of fact could completely disregard his opinion. Mr. Grunin also rejects the testimony of Mr. Longaker offered by the State and takes issue with the State's failure to offer any expert rebuttal to Dr. Kanner's expert opinion.

¶ 59　As discussed, the trier of fact assesses witness credibility including experts, determines the weight afforded to witness testimony, and resolves conflicts or inconsistencies in the evidence. *Bradford*, 2016 IL 118674, ¶ 12. When faced with conflicting versions of events, a factfinder is "entitled" to choose among them and is not obligated to accept the defendant's version. *People v. Villarreal*, 198 Ill. 2d 209, 231 (2001). This remains true with expert opinions, as well as lay witnesses. Thus, the trier of fact need not accept the opinions of a defendant's expert witnesses. See *People v. Dresher*, 364 Ill. App. 3d 847, 855-56 (2006); see also *People v. Peterson*, 171 Ill. App. 3d 730, 734 (1988). "In situations where medical experts are called to testify, their comparative credibility and the weight to be accorded to their testimony is determined by the trier of fact." *People v. Klein*, 2015 IL App (3d) 130052, ¶ 101.

¶ 60　Dr. Kanner concluded that, absent evidence that Mr. Grunin was suicidal or distracted, the *only* explanation for Mr. Grunin's collision with the Lendino's vehicle was that he had a seizure and, therefore, could not control his body. However, Dr. Kanner acknowledged that Mr. Grunin did not self-report a seizure on the day of the accident, Mr. Grunin's medical records did not state that Mr. Grunin suffered a seizure that day, and no EEG was performed. Dr. Kanner also admitted that, although he believed Mr. Grunin suffered a seizure, he was unable to determine when Mr. Grunin's seizure began. It could have occurred prior to the collision with Ms. Brito, been triggered by the first collision, or began during the first collision and continued until the collision with the Lendino's vehicle.

¶ 61　Regarding Mr. Grunin's ability to control his body during a seizure, Dr. Kanner testified that a person experiencing a seizure is unaware of events and exhibits "automatic behavior" and that, at the commencement of a seizure, a person could exhibit partial awareness and maneuver a vehicle prior to losing full awareness of his surroundings. Accordingly, even accepting Mr.

Grunin's assertion that Dr. Kanner's testimony was "unrebutted" by the State, the jury was still entitled to evaluate the substance of the testimony and decide whether to accept the entirety of Dr. Kanner's opinion. Mr. Grunin's argument on rehearing suggests that because Dr. Kanner's opinion was unrebutted, the jury was required to believe that, since Dr. Kanner was presented as an expert in epilepsy, his theory that Mr. Grunin suffered a seizure prior to the second collision had to be accepted by the jury in its entirety. However, even if Dr. Kanner's opinion had some probative value, it was not dispositive for the jury. Notably, while Dr. Kanner opined that Mr. Grunin had a seizure, he could not testify with a reasonable degree of medical certainty as to *when* Mr. Grunin had the seizure, only that in his opinion, it occurred sometime prior to the second collision. In reality that calls into question an indeterminate time parameter. That question was important in the determination of whether Mr. Grunin's actions were volitional.

¶ 62    We note that the jury also considered the testimony of the accident collision reconstruction experts in its determination. The State's expert opined that Mr. Grunin controlled his vehicle at the time of the collision and Mr. Grunin's expert opined that he did not. See *Dresher*, 364 Ill. App. 3d at 855-56 (it is the role of the trier of fact to evaluate an expert's testimony and assess his or her credibility). Here, the jury clearly found relevant portions of Sergeant Ashleman's testimony and opinion persuasive and rejected Mr. Barrett's opinion. See *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 53 (a trier of fact is not "required to accept the defendant version of the facts"). We cannot say that, under these facts and circumstances, such a determination is unreasonable and warrants overturning the jury's verdict.

¶ 63    Mr. Grunin's arguments on appeal and upon rehearing, which mirror those presented at trial, offer an affirmative explanation for the collision with the Lendino's vehicle, *i.e.*—he suffered a focal epileptic seizure with loss of awareness and was unaware of his surroundings—which the

jury rejected in favor of the State's evidence. We decline Mr. Grunin's invitation to reweigh the evidence. See *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991) ("A reviewing court has neither the duty nor the privilege to substitute its judgment for that of the trier of fact.").

¶ 64    While Mr. Grunin argues in his reply brief that "every piece of evidence described by the State" was "consistent" with the defense theory that Mr. Grunin suffered a loss of awareness, the question before this court is *whether any rational trier of fact could have found the elements of the offenses proven beyond a reasonable doubt. McLaurin*, 2020 IL 124563, ¶ 22. Although a defense expert testified that the only explanation for Mr. Grunin's failure to avoid the Lendino's vehicle was that at some point prior to the collision, Mr. Grunin suffered a focal seizure leading to a loss of awareness, the evidence nonetheless established that Mr. Grunin was speeding, continued driving after one accident, and accelerated immediately prior to hitting the Lendino's vehicle in the second accident. The jury clearly found that the State's version of the facts more persuasive. In other words, it cannot be said that *no* rational trier of fact could find Mr. Grunin guilty considering the evidence presented. A conviction will be overturned only if the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of guilt (*Newton*, 2018 IL 122958, ¶ 24).

¶ 65    While this court may have reached a different conclusion had we been the trier of fact, the resolution does not turn on what a different trier of fact may have done. Rather, as discussed, we must determine whether *any* rational trier of fact could have found Mr. Grunin guilty when the totality of the evidence is viewed in the light most favorable to the State. That standard does not permit this court to substitute its judgment on factual issues for that of the trier of fact. Clearly, the jury believed the State's version of the events and not those presented by the defense. We cannot say that the jury's conclusion was irrational. Therefore, upon rehearing, we find the evidence

sufficient to establish Mr. Grunin's guilt on each and every count and affirm his convictions as merged into the conviction for reckless homicide.

¶ 66                                    CONCLUSION

¶ 67     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 68     Affirmed.

**No. 1-20-0598**

| | |
|---|---|
| **Cite as:** | *People v. Grunin*, 2022 IL App (1st) 200598 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-12063; the Hon. Joseph Michael Cataldo, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Hannah Lazar Pieterse, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |