2024 IL App (2d) 230270-U
No. 2-23-0270
Order filed April 2, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 18-CF-308 |
| | ) | 18-TR-4557 |
| | ) | 18-TR-4558 |
| | ) | |
| KEVIN D. TAYLOR, | ) | Honorable |
| | ) | Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant, who lost control of his vehicle at an intersection and struck an oncoming vehicle, was properly found to have driven recklessly given his excessive speed (71 to 73 miles per hour in a 45-mile-per-hour zone), the busy traffic, his frequent lane changes, the wet pavement, and the hump in the intersection, which caused even vehicles traveling the speed limit to "jump" as they passed.

¶ 2   Defendant, Kevin D. Taylor, appeals his convictions of reckless homicide (720 ILCS 5/9-

3(a) (West 2018)) and aggravated reckless driving (625 ILCS 5/11-503(a)(1), (c) (West 2018)).

He contends that the evidence was insufficient to prove beyond a reasonable doubt that he drove

his vehicle recklessly. We affirm, based on defendant's excessive speed and other indicia of a conscious disregard of a substantial and unjustifiable risk of death or great bodily harm.

¶ 3                                    I. BACKGROUND

¶ 4     The State indicted defendant on one count of reckless homicide (720 ILCS 5/9-3(a) (West 2018)) and one count of aggravated reckless driving (625 ILCS 5/11-503(a)(1) (West 2018)), based on his having driven his vehicle recklessly and causing the death of the driver, and great bodily harm to the passenger, of another vehicle. Defendant was also charged with improper lane usage (625 ILCS 5/11-709(a) (West 2018)) and driving 35 miles per hour or more over the speed limit (625 ILCS 5/601.5(b) (West 2018)) (defendant was specifically alleged to have driven 38 miles per hour over the speed limit).

¶ 5     The following facts were developed at defendant's bench trial. On January 24, 2018, at about 4:52 p.m., defendant was driving his 2007 Ford Mustang south on Peace Road as it approached the intersection with Pleasant Street. Peace Road is a four-lane road at that location, with two lanes in each direction. The posted speed limit was 45 miles per hour.

¶ 6     Amy Dwyer was driving in the inside southbound lane of Peace Road at close to 50 miles per hour. In her rearview mirror, she observed defendant's vehicle "weaving in and out of *** traffic." As she approached the intersection with Pleasant Street, defendant passed her in the outside lane "like [she] was standing still." Dwyer described the intersection as having a "little hump, dip, whatever" that would cause a vehicle to "jump up a little bit" if it drove through the intersection "at a decent amount of speed." According to Dwyer, as defendant's vehicle entered the intersection, it "did *** a little jump," lost control, turned sideways, entered the northbound lanes of Peace Road, and struck a white northbound vehicle. Dwyer estimated she was about half of a football field away when the accident occurred.

¶ 7     On cross-examination, Dwyer testified that the road surface was wet but not icy or foggy. Nor was it snowing.

¶ 8     Summer Heine was also driving south on Peace Road when the accident occurred. She described the traffic as "fairly busy" because it was "after work hours." She was driving south in the inside lane, and a UPS delivery truck was directly in front of her going south as she approached the intersection with Pleasant Street. Defendant's vehicle was directly behind Heine's vehicle. As Heine approached the intersection, defendant's vehicle pulled into the outside lane to pass her. It then reentered the inside lane between Heine's vehicle and the UPS truck. Heine estimated that the space between her and the UPS truck was one or two car lengths when defendant reentered the lane. According to Heine, defendant's vehicle was traveling at a speed sufficient to pass her. After defendant's vehicle switched lanes, Heine saw it veer into the oncoming lanes. She then heard a crash behind her.

¶ 9     On cross-examination, Heine testified there was "like a frost on the road." The road surface "didn't seem slippery, but it did have kind of a sheen to it."

¶ 10    Christopher Lay was driving his UPS delivery truck south on Peace Road when the accident occurred. He described the traffic as "fairly busy" because it was after people got off work. Although it had not rained or snowed, the road was damp. Although Lay was driving at the speed limit without issue, it "could have been a little slippery" in another lane.

¶ 11    Before reaching the intersection with Pleasant Street, Lay observed behind him a Mustang driving south on Peace Road. Lay was in the inside lane as he passed through the intersection. After he drove through the intersection, he looked in his right-side mirror and saw the Mustang start to spin sideways. The Mustang then went out of sight behind his vehicle before reappearing in his left-side mirror. At that point, the Mustang struck a northbound vehicle. It appeared to Lay

that the Mustang had attempted to pass in the outside lane when it lost traction in the rear, spun sideways, went into the northbound lanes, and struck a vehicle. Lay estimated that the collision occurred about 100 feet behind his vehicle.

¶ 12    On cross-examination, Lay testified that he was driving at or under the 45-mile-per-hour speed limit when the accident occurred. Lay said the Mustang "wasn't driving erratic[ally]." On redirect examination, Lay could not estimate how fast the Mustang was driving. The Mustang appeared to be "hunting for the fastest lane or the least amount of traffic or least resistance."

¶ 13    Officer Jeffrey Winters of the De Kalb police department was dispatched to the scene. He observed extensive front-end damage to a white Toyota Corolla, which had all of its airbags deployed. The driver of the Toyota, Rachel Jimenez, was "unconscious, unresponsive and *** didn't look to be alive." Her son, Isaac Jimenez, was alive in the front passenger seat. The Mustang was also in the northbound lanes, somewhat south of the Toyota. Its driver was sitting on a curb.

¶ 14    According to Winters, "slight moisture [was] on the pavement." When he walked on the pavement, it "[felt] like it was starting to get a little bit slippier [*sic*] than normal pavement texture." However, there was no "actual ice or accumulation of water or snow or ice" on the pavement.

¶ 15    Winters testified that the posted speed for Peace Road at the intersection was 45 miles per hour. The intersection had a "little bit of a rise and a slight *** swale." A driver would definitely "notice it even at 45 [miles per hour] that your vehicle will kind of bounce."

¶ 16    On cross-examination, Winters admitted that he drove to the scene safely and had no issues with the road surface. He testified that the impact occurred about 100 yards south of the intersection. He added that the road surface was "a little wet but it wasn't icy," and there was no snow.

¶ 17    The State offered expert testimony regarding the speed of both vehicles just before and when the accident occurred. Trooper Paul Kuhn of the Illinois State Police testified as an expert on evidence data recording information. He was able to retrieve, via computer software, data from an airbag module on the Toyota. Based on that data, Kuhn opined that the Toyota was traveling at 45.4 miles per hour at impact.

¶ 18    Kuhn also retrieved data from the power train module on defendant's Mustang. According to Kuhn, the module recorded data on a continuous 25-second loop. Thus, there was data available for the 25 seconds just before the Mustang lost power from the impact.

¶ 19    According to Kuhn, the data showed that the Mustang was traveling at 79 miles per hour four seconds before power loss, 81 miles per hour three seconds before power loss, 79 miles per hour two seconds before power loss, and 55 miles per hour one second before power loss. The speed at power loss was only 17 miles per hour. Only a collision could have caused such a rapid drop in speed. Based on the recorded data, Kuhn opined that the highest rate of speed within five seconds before power loss was 83 miles per hour.

¶ 20    Eric Paul testified for defendant as an expert on crash reconstruction and data retrieval. According to Paul, photos and police videos showed that the road was wet in the area of the accident. He added that the weather data for that day showed that it was "below freezing pretty much that whole day," which indicated that "ice [was] certainly possible." Although the road "look[ed] wet, *** black ice can look wet too. It's hard to know whether it's frozen or not sometimes on the road surface."

¶ 21    Paul testified that he obtained exactly the same data from the two vehicles as Kuhn. He agreed with some of Kuhn's conclusions. For instance, he agreed that the speed of the Toyota was 45.4 miles per hour. He also agreed that the data from the power train module of the Mustang

showed 83 miles per hour. But he disagreed that that was the actual speed of the Mustang. He explained that the data was based on the rotation of the wheels and that if the wheels did not maintain a constant straight contact with the road, then the rotational wheel speed would be higher than the vehicle's actual speed. He opined that, because of the sideways motion of the Mustang before impact, its actual speed never reached the 83-mile-per-hour rotational speed of the wheels as indicated on the power train module. Instead, based on the recovered data, he estimated that the Mustang's actual speed in the few seconds before power loss was 70 to 72 miles per hour. Paul further testified that there was no evidence of erratic driving.

¶ 22    On cross-examination, Paul acknowledged that a written police report indicated that defendant told an officer that he was attempting to pass vehicles in the inside lane when he hit a patch of ice and lost control of his vehicle. Paul explained that his testimony that there was no evidence of erratic driving was based on the lack of any data from the Mustang in that regard and the lack of any investigative information, such as tire marks on the pavement. He admitted that, when he reviewed the case, he had no witness statements about defendant's driving. He reaffirmed his opinion that the 83-miles-per-hour reading from the power train module was the rotational speed of the Mustang's wheels, not the vehicle's actual speed. Paul explained that the higher rotational speed was due to the rear (drive) axle going airborne, the vehicle hitting a patch of ice, or "something [else] that caused less friction to be available." He agreed that the Mustang was likely traveling at 71 to 73 miles per hour four seconds before the collision.

¶ 23    The trial court found defendant guilty of reckless homicide, aggravated reckless driving, and improper lane usage. As to the speeding charge (see 625 ILCS 5/11-601(b) (West 2018)), which alleged that defendant drove 38 miles per hour over the 45-mile-per-hour speed limit, or 83 miles per hour, the court rendered its decision "[w]ithout getting into wheel speed, without getting

into the 83 miles [per] hour." Specifically, the court noted that, because defendant's own expert agreed that defendant drove 26 to 28 miles per hour over the speed limit, or 71 to 73 miles per hour, defendant was guilty of the lesser offense of driving 25 miles per hour or more above the speed limit (see 625 ILCS 5/11-601(a) (West 2018)).

¶ 24 Regarding recklessness, the trial court recognized that "speed alone does not equal recklessness." It then noted that both experts agreed that defendant "was driving in excess of 70 miles an hour in a 45-mile-an-hour zone before the crash." The court then looked at evidence other than speed. The court found that traffic was "moderate to fairly busy." The court further noted that Dwyer testified that defendant was weaving in and out of traffic and that Lay testified that defendant was switching lanes frequently as though he was "hunting for the fastest lane." The court also considered the road conditions. It noted that witnesses described the road as damp, moist, or wet. The court further noted Paul's testimony that defendant told the police that he hit a patch of ice and lost control of his vehicle. Also, relying on *People v. Markley*, 2013 IL App (3d) 120201, the court found further indicia of recklessness in defendant's crossing the intersection at excessive speed despite the danger posed by the hump in the intersection.

¶ 25 The trial court concluded that defendant drove recklessly, based on his

"driving *** at an excessive rate of speed, at least 25 miles an hour over the speed limit, when combined with the traffic conditions, the weather conditions, the weaving in and out of traffic, the road conditions, crossing into the oncoming lane of traffic, and all the other evidence."

Thus, the court found defendant guilty of both reckless homicide and aggravated reckless driving.

¶ 26 Following the denial of defendant's posttrial motion, the trial court sentenced him to 180 days in jail and 24 months' probation. Defendant, in turn, filed this timely appeal.

¶ 27                                    II. ANALYSIS

¶ 28     On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that he drove his vehicle recklessly. We disagree.

¶ 29     When reviewing a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22. The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *McLaurin*, 2020 IL 124563, ¶ 22. In reviewing the evidence, we will not retry the defendant or substitute our judgment for that of the trier of fact. *McLaurin*, 2020 IL 124563, ¶ 22. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 30     A person commits reckless homicide when he causes the death of another by driving a motor vehicle recklessly in a manner likely to cause death or great bodily harm. 720 ILCS 5/9-3(a) (West 2018). A person commits aggravated reckless driving when he drives any vehicle with a willful or wanton disregard for the safety of persons or property and causes great bodily harm, permanent disfigurement, or disability. 625 ILCS 5/11-503(a)(1), (c) (West 2018). Both offenses require proof of recklessness.

¶ 31     A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to some individual and such disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation. *People v. Grunin*, 2022 IL App (1st) 200598, ¶ 51. Recklessness may be inferred

from all the facts and circumstances in the record and may be established by evidence of the physical condition of the driver and his manner of operating the vehicle. *Grunin*, 2022 IL App (1st) 200598, ¶ 51. Whether given conduct is reckless is a question of fact for the trier of fact. *Grunin*, 2022 IL App (1st) 200598, ¶ 51.

¶ 32    Although evidence of excessive speed alone is insufficient to sustain a finding of recklessness, excessive speed suffices when combined with other circumstances that indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others such that a reasonable person would have acted differently under the same circumstances. *Grunin*, 2022 IL App (1st) 200598, ¶ 52. When there is excessive speed in a nonemergency situation that causes the death of another, it is unlikely that there would not be other circumstances sufficient to show that the defendant consciously disregarded a substantial and unjustifiable risk and that such disregard grossly deviated from the standard of care that a reasonable person would exercise in the same circumstances. *Grunin*, 2022 IL App (1st) 200598, ¶ 52.

¶ 33    Here, we begin with defendant's speed. The undisputed evidence established that his speed was between 71 and 73 miles per hour just seconds before the collision. Aside from other circumstances, that speed was significant because it was more than 25 miles per hour over the posted speed limit of 45 miles per hour. Any posted speed limit is designed, in part, to promote traffic safety. See *Machado-Miller v. Mersereau & Shannon, LLP*, 43 P.3d 1207, 1211 (Or. Ct. App. 2002) (the purpose of a speed limit is to promote highway safety); *People v. Williams*, 222 Cal. Rptr. 527, 533-34 (Cal. App. Dep't Super. Ct. 1985) (same). Although such speed was not by itself sufficient to support a finding that defendant drove recklessly, it clearly was excessive and contributed to the finding of recklessness.

¶ 34    In addition to defendant's excessive speed, other circumstances supported the finding of recklessness. First, two witnesses testified that the traffic flow was "fairly busy" because of post-work traffic. Because of that busier traffic, defendant could not maintain his excessive speed without passing other vehicles and changing lanes frequently as he drove south on Peace Road. Indeed, several witnesses testified that defendant was passing other vehicles and changing lanes as he approached the intersection with Pleasant Street. Further, busy traffic conditions increased the likelihood that if defendant lost control of his vehicle, he would collide with another vehicle, perhaps even one in an oncoming lane. Notwithstanding that he might have used proper turn signals in doing so, defendant's frequent passing of other vehicles and changing lanes in busy traffic certainly made it riskier to drive 25 miles per hour over the posted speed limit.

¶ 35    Second, numerous witnesses testified that the road surface was wet. Logically, a wet road will be slipperier than a dry one. Indeed, a wet road will likely affect braking or accentuate any sliding, such as what occurred here. Undoubtedly, driving 25 miles per hour over the posted speed limit was made riskier by a wet road surface. That is particularly true considering that defendant frequently changed lanes while driving at a high speed. The wet, and hence, slipperier road, would also have increased the risk that, if defendant lost control of his vehicle, he would be unable to regain control before striking another vehicle. Thus, the wet road further supported the finding of recklessness.

¶ 36    Third, in addition to the excessive speed, busy traffic, and a wet road, there was a hump or rise in the road surface at the intersection with Pleasant Street. Dwyer testified that a vehicle driving through the intersection at a "decent amount of speed" would "jump up a little bit." Winters testified that a vehicle going 45 miles per hour through the intersection would "kind of bounce." Of course, traveling through the intersection at 71 to 73 miles per hour would accentuate the effect

of the hump. Indeed, hitting the hump at a high rate of speed increased the likelihood that defendant would lose control of his vehicle. See *Markley*, 2013 IL App (3d) 120201, ¶¶ 1, 28 (high speed combined with a "slight dip in the road" near where the defendant lost control of his vehicle supported conviction of aggravated reckless driving). Thus, the hump in the intersection further supported the finding of recklessness.

¶ 37    Given defendant's excessive speed, the busy traffic, the wet road surface, and the hump in the intersection, there was ample evidence, when viewed in the light most favorable to the prosecution, that defendant was driving recklessly within the meaning of the reckless homicide and aggravated reckless driving statutes. Thus, he was proved guilty beyond a reasonable doubt of both offenses.

¶ 38                                  III. CONCLUSION

¶ 39    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 40    Affirmed.